# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | | |
|---|---|---|
| RALLS CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 3:13-cv-213-TCB |
| HUERFANO RIVER WIND, LLC, | ) | |
| U.S. INNOVATIVE RENEWABLE | ) | |
| ENERGY, LLC, and | ) | |
| XIAOLIN "JERRY" ZHANG, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR APPOINTMENT OF RECEIVER

John P. MacNaughton
Ross A. Albert
Brian J. Levy
Morris, Manning & Martin LLP
1600 Atlanta Financial Center
3343 Peachtree Road, NE
Atlanta, Georgia 30326

*Attorneys for Plaintiff Ralls Corporation*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ....................................................................................1

RELEVANT FACTS .............................................................................3

    A.    The Wind Project Transaction................................................4

    B.    HRW Defaults Under the Loan Agreement and the Note. ..................5

    C.    Zhang's Control Places Ralls' Collateral in Imminent
        Danger. .......................................................................16

ARGUMENT .......................................................................................17

CONCLUSION ....................................................................................21

# TABLE OF AUTHORITIES

## Cases

*Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc.*, 999 F.2d 314 (8th Cir. 1993) ...................................................................19

*Bookout v. Atlas Fin. Corp.*, 395 F. Supp. 1338 (N.D. Ga. 1974).............. 19, 20, 21

*In re McGaughey*, 24 F.3d 904 (7th Cir. 1994) .......................................18

*Nat'l P'ship Inv. Corp. v. Nat'l Hous. Dev. Corp.*, 153 F.3d 1289 (11th Cir. 1998) ...................................................................18

*Otero v. Vito*, No. 5:07-cv-405, 2008 WL 4004979, at *3 (M.D. Ga. Aug. 25, 2008) ................................................................ 19, 20, 21

## Statutes

28 U.S.C. § 754 .......................................................................18

Pursuant to Local Rule 7.1, Plaintiff Ralls Corporation ("Ralls"), by its attorneys, files its Memorandum of Law in Support of its Motion for Appointment of Receiver, showing this Court as follows:

## INTRODUCTION

Ralls, as a secured lender, filed this action for compensatory damages and other relief related to multiple breaches of various loan agreements and other improper acts undertaken by Defendant Xiaolin "Jerry" Zhang ("Zhang") and two companies that he controls, Huerfano River Wind, LLC ("HRW") and U.S. Innovative Renewable Energy, LLC ("USIRE").  HRW is a wholly-owned subsidiary of USIRE.  Zhang is the sole owner of USIRE.  Zhang is the Managing Member of both USIRE and HRW.

Zhang caused HRW (then known as New Centennial Power, LLC) to enter into a Loan and Security Interest Agreement dated as of March 22, 2013 (the "Loan Agreement"), pursuant to which Ralls provided HRW with a total of $13,408,913 to construct a wind power generation project (the "Wind Project") located in Huerfano County, Colorado.  (Declaration of John P. MacNaughton ("MacNaughton Decl." or "MacNaughton Declaration") ¶ 19.)  Zhang likewise caused HRW to execute a Secured Promissory Note dated March 22, 2013 (the "Note") in favor of Ralls.  (MacNaughton Decl. ¶ 20.)

— 1 —

HRW has defaulted on virtually every material obligation under the Loan Agreement and the Note, and Zhang has given every indication that he and his related entities will continue to disregard their obligations under the Loan Agreement and the Note.

The sole source of repayment of the secured indebtedness to Ralls is revenue generated through the sale of electricity to San Isabel Electric Association, a Colorado cooperative ("SIEA").  Pursuant to the Loan Agreement and Note, payments received from SIEA by HRW are to be distributed 95% to Ralls and 5% to HRW, after the deduction of strictly defined expenses, such as maintenance fees, taxes and mandatory (*i.e.*, legally required) obligations.  On January 28, 2014, HRW, in a purported attempt to comply with its requirement to provide a Net Cash Flow analysis pursuant to the Note, submitted to Ralls a "Profit & Loss Statement" for the calendar year 2013.  On January 30, 2014, HRW submitted documentation purportedly supporting the "Profit & Loss Statement."  That documentation, on its face, makes clear that Zhang and his entities are flagrantly misusing Ralls' collateral for their own purposes, including diverting all revenues of the Wind Project for improper and wholly unauthorized purposes, including the payment of significant sums to Zhang's wife as "salary" and to Zhang's wholly-owned entity,

USIRE, as purported "asset management fees," among other unauthorized expenditures, in addition to the apparent funding of the defense of this action.

HRW's sole purpose, as a single purpose entity, is to own the Wind Project. The only on-going operations at the Wind Project site are the work of technicians employed by Ralls pursuant to a Maintenance and Warranty Services Agreement to maintain the wind turbines. Nonetheless, as shown by documents submitted in support of the "Profit & Loss" statement, Zhang has caused HRW to enter into an executive employment agreement with his wife and an asset management agreement with USIRE, which commit HRW to paying out $615,000 annually to Zhang and his wife for unauthorized, if not spurious services.

As a result, Ralls must petition this Court for appointment of a receiver in order to preserve the collateral and prevent Zhang and his related entities from misappropriating all revenues from HRW, and rendering worthless any judgment Ralls might ultimately recover.

## RELEVANT FACTS

Starting in or around October 2012, Ralls began negotiating with Zhang regarding his and USIRE's involvement in the anticipated Wind Project. (Complaint ("Compl.") ¶ 10.) At that time, Ralls and its senior executives knew and trusted Zhang from previous dealings with Zhang, and Ralls had a relationship

of trust and confidence with Zhang.  (Compl. ¶ 11.)  Zhang knew that Ralls was relying on Zhang's honesty and integrity in deciding whether to partner with him and USIRE to develop the Wind Project.  (Compl. ¶ 12.)  Relying on Zhang's honesty and good faith, Ralls decided to proceed with the Wind Project.  (Compl. ¶ 13.)  Pursuant to said transaction, Ralls financed 100% of all costs related to the Wind Project.

### A.    The Wind Project Transaction.

On or about March 22, 2013, HRW, an entity acquired by USIRE and Zhang with funds borrowed from Ralls, entered into a series of related transactions memorialized in integrated agreements, pursuant to which Ralls provided a loan to HRW to supply turbines and construct the Wind Project.  (Declaration of David Liu ("Liu Decl." or "Liu Declaration") ¶ 6.)

Ralls and HRW entered into a Turbine Supply Agreement (the "TSA"), whereby HRW agreed to pay Ralls $8,800,000 for four wind turbine generators (the "Turbine Price").  (Liu Decl. ¶ 7; MacNaughton Decl. ¶ 21.)  In connection with the TSA, Ralls and HRW entered into the Loan Agreement, whereby Ralls agreed to make available to HRW a loan in the aggregate principal amount of $13,408,913 (the "Loan").  (Liu Decl. ¶ 8; MacNaughton Decl. ¶ 19.)  The Loan consisted of three components:  (1) the Turbine Price; (2) an acquisition loan in the

amount of $1,094,872 (the "Acquisition Cost"); and (3) construction costs in an amount defined to be $3,514,041, with the possibility of upward adjustment (the "Construction Cost" and, collectively with the Acquisition Cost, the "Project Cost"). (Liu Decl. ¶ 8; MacNaughton Decl. ¶ 19.)

As a condition of the Loan Agreement, HRW executed and delivered to Ralls the Note for the Loan. (Liu Decl. ¶ 9; MacNaughton Decl. ¶ 20.) The Loan Agreement defined "Events of Default" to include, among other things, the failure of HRW to perform any of its obligations, covenants or agreements under the Loan Agreement or the Note. (Liu Decl. ¶ 10; MacNaughton Decl. ¶ 19.) Pursuant to the Loan Agreement and the Note, upon the occurrence of any Event of Default, Ralls had the right to accelerate the maturity of the indebtedness evidenced by the Note, which would "be immediately due and payable in full" without notice of any kind. (Liu Decl. ¶ 11; MacNaughton Decl. ¶ 19.) Upon the occurrence of any such Event of Default and the acceleration of the maturity of the indebtedness evidenced by the Note, Ralls would be immediately entitled to exercise any and all rights and remedies under the Loan Agreement and the Note. (*Id.*)

## B.   HRW Defaults Under the Loan Agreement and the Note.

In August 2013, immediately prior to commencement of operations, HRW defaulted with respect to its first financial obligation under the Loan Agreement

and Note.  By letter sent via email and certified mail to HRW and HRW's counsel on August 26, 2013 (the "August 26 Letter"), Ralls provided HRW with notice of its default under the Note.  (Liu Decl. ¶ 13; MacNaughton Decl. ¶ 24.)  Pursuant to the Note, "the Acquisition Cost shall become immediately due and fully payable" to Ralls upon "the date on which the actual amount of the Construction Cost has exceeded [$2,419,169]."  (Liu Decl. ¶ 13; MacNaughton Decl. ¶ 20.)  The August 26 Letter informed HRW that the Construction Cost had exceeded this amount, and demanded immediate payment of the Acquisition Cost in the sum of $1,094,872.  (Liu Decl. ¶ 13; MacNaughton Decl. ¶ 24.)  Further, HRW has failed to make any payment with respect to said Acquisition Cost and, to date, evidences no intent to make any payments despite the unrefuted fact that said payment is due and owing.  (Liu Decl. ¶ 14.)

Additionally, HRW has failed and refused to establish a "mutually designated account" as required pursuant to the Loan Agreement for the protection of Ralls and for the control of revenues received by HRW from SIEA and payments made to any third parties.  By letter sent via email and certified mail to Zhang and Zhang's counsel on November 26, 2013 (the "November 26 Letter" and, collectively with the August 26 Letter, the "Default Letters"), Ralls notified

HRW that HRW was in default of Article 1.4 of the Loan Agreement.  (Liu Decl.

¶ 15; MacNaughton Decl. ¶ 25.)  Article 1.4 of the Loan Agreement states in full:

> **Account Control.**  [HRW] and [Ralls] hereby agree that any cash received (i) from any sources as Taxes and Grants (as defined hereinafter) and (ii) from San Isabel Electric Association, Inc., a Colorado cooperative ("SIEA") the Power Purchase Agreement between SIEA and the Borrower, dated December 20, 2012, shall be, without any further actions to be taken by [Ralls], directly deposited to an account mutually designated by [Ralls] and [HRW], for the sole purposes of facilitating the calculation of Net Cash Flow (as defined in the Note) and the repayment of the Note in accordance with the terms and conditions of the Note. The parties hereto further agree that (x) any single payment in the amount in excess of $5,000, or (y) any payment that shall make the total payments in a calendar month to exceed $10,000, in either case to be made out of such mutually designated account to any third party, shall be made only upon the written approval of [Ralls]. The parties hereto both agree to make commercially reasonable efforts to establish a work protocol and designate relevant individual officers to implement the letter and spirit of this provision, and any breach of the [HRW's] obligations hereunder shall be deemed as an event of default by [HRW].

(Liu Decl. ¶ 15; MacNaughton Decl. ¶ 19.)   HRW has refused to open and

administer an account mutually designated by Ralls and HRW.  (Liu Decl. ¶ 16.)

Instead, HRW has unilaterally deposited revenues from SIEA (the "SIEA

Revenues") into an account controlled by HRW and has used the SIEA Revenues

for purposes other than repayment of the Loan.  (*Id.*)   Based on recent

communications from HRW and documents relating to distributions of SIEA Revenues provided by HRW, it is unquestionably clear that Zhang is misappropriating the SIEA Revenues to fund wholly unauthorized distributions including payments to Zhang's wife for purported employment services,[1] to USIRE (owned 100% by Zhang) for alleged "asset management fees,"[2] and for multiple other unauthorized purposes, apparently including the defense of this action. (*See* MacNaughton Decl. ¶¶ 2-15.)  HRW remains in default under Article 1.4 of the Loan Agreement and, thus, is in default under the Loan Agreement and the Note. (Liu Decl. ¶ 18.)

Indeed, said payments, as indicated on the "Profit & Loss Statement" provided by HRW, appear to have rendered HRW insolvent, said statement

---

[1] The employment agreement with Mrs. Zhang is spurious, as there are no services for her to provide to HRW.  HRW's sole purpose is to own the Wind Project.  All services for the Wind Project are provided on-site by Ralls' employees.  Moreover, even if the agreement were bona fide, Zhang's agreement with his wife violated Section 1.4 of the Loan Agreement because HRW has made payments under the agreement in excess of $5,000 without Ralls' written approval.

[2] Similarly, the alleged "Asset Management Agreement" between HRW and USIRE (a copy of which has not been provided to Ralls) is a fiction.  There is nothing for USIRE to "manage."  The disposition of HRW's incomes from its utility customer, SIEA, is dictated by the Loan Agreement and Note.  Moreover, as with Zhang's agreement with his wife, payments under the elusive "Asset Management Agreement" violated Section 1.4 of the Loan Agreement because they are in excess of $5,000, and paid without Ralls' written approval.

indicating current negative income in the amount of $337,420.27.  (MacNaughton

Decl. ¶ 2.)

Pursuant to the Note, HRW is required to make quarterly installment

payments on the Loan in the amount of 95% of the Net Cash Flow generated from

the Wind Project.  (Liu Decl. ¶ 19; MacNaughton Decl. ¶ 20.)  The Note provides:

> The principal amount of the Turbine Price and the Project
> Cost shall be due and payable quarterly, in arrears, with
> the first installment being payable on the fifteenth (15th)
> day (or if the banks are not open on such day, the next
> banking day) of the third (3rd) calendar month after the
> month that the Commissioning Date falls into
> ("Commercial Operation Date" is the date certain wind
> farm project in Huerfano County, Colorado (the
> "Project") using the four 2.0 MW wind turbine
> generators and the other related equipment shall
> commence its commercial production of electricity), and
> subsequent quarterly installments being payable on the
> fifteenth (15th) day (or if the banks are not open on such
> day, the next banking day) of the month immediately
> after each succeeding three-full-calendar-month period
> thereafter until the full amount hereof has been fully
> repaid (the "Termination Date"). The amount of each of
> such quarterly installment payment for the principal
> amount of the Loan shall be ninety-five percent (95%) of
> the Net Cash Flow generated from the Project from the
> three full calendar month period immediately preceding
> the first day of the month of the due date of payment (but
> in the case of the first installment payment, from the
> Commercial Operation Date to the first day of the month
> in which the first installment payment is due) . . . .

(*Id.*)  The sole source of revenue generated from the Wind Project is the SIEA Revenues.  (Liu Decl. ¶ 20.)

The Profit & Loss Statement rendered by HRW on January 28, 2014, purporting to calculate Net Cash Flow for purposes of the Note and the Loan Agreement, shows that HRW's sole income was the SIEA Revenues in the amount of $327,102.50.  (MacNaughton Decl. ¶ 2.)  However, said Statement further reflects several hundred thousands of dollars of purported expenses that are neither permissible under the definition of "Net Cash Flow" set forth in the Note, nor were they incurred and paid in compliance with Section 1.4 of the Loan Agreement, which requires the written approval of Ralls for any single payment by HRW out of the SIEA Revenues of more than $5,000.  (Liu Decl. ¶ 21; *see* MacNaughton Decl. ¶¶ 2, 19, 20.)  Ralls not only never approved, in writing or otherwise, any of the purported expenses shown on the Profit & Loss Statement, but also the vast majority of the distributions by HRW clearly demonstrate an intentional misappropriation if not outright "looting" of the assets of HRW in an obvious attempt to make HRW incapable of making any payments, as required, to its secured lender.

The unauthorized expenses listed in the Profit & Loss Statement include, but are not limited to, the following:

1.    $125,000 for "Payroll Expense"

- Based on the documentation recently provided by Defendants' counsel, said $125,000 reflects salary paid to Zhang's wife, Lu Zhang, a North Carolina resident, pursuant to an "Executive Employment Agreement," which provides that she will be paid a monthly base salary of $12,500.00.  (MacNaughton Decl. ¶ 6.)

- The Executive Employment Agreement is signed, but not dated. (*Id.*)  The agreement provides that it is "effective as of March, 2013" (despite the fact that the Wind Farm only commenced operation in October 2013).  (*Id.*)  Accordingly, the Profit & Loss Statement reflects 10 months of salary payments or accruals to Lu Zhang of $125,000.00.

2.    $155,000 for "Professional Fees – Other"

- Based on documentation provided by Defendants' counsel, the $155,000 charge purports to reflect payment or accrual of an unauthorized "asset management fee" to Zhang's company, USIRE.  (MacNaughton Decl. ¶ 3.)

- Invoices from USIRE purport to represent an "appraisal value" of HRW as $15,500,000.00, and claim a previously undisclosed

"annual asset management fee" of 3% of the appraisal value pursuant to the further undisclosed "asset management agreement." (*Id.*)  The invoice dated September 1, 2013 is apparently "pro-rated" for the September to December 2013 period.  (*Id.*)  A second invoice dated January 1, 2014 purports to charge HRW, in advance, the full annual fee of $465,000.00 for 2014.  (*Id.* ¶ 4.)

3.     $139,430.00 for "Legal Fees"

- To date, despite repeated requests, Defendants have provided Ralls with no supporting documentation for these "legal fees"; however, no deduction for such fees is allowed pursuant to the terms of the Note.

4.     $28,000.00 for "Accounting"

- To date, despite repeated requests, Defendants have provided Ralls with no supporting documentation for "accounting"; however, no deduction for such fees is allowed pursuant to the terms of the Note.

5.     $19,336.67 for "Consulting"

- Based on documentation provided by Defendants' counsel, the $19,336.67 appears to be an amount paid to CohnReznick LLP for

a "valuation analysis" to determine the fair market value of HRW. (MacNaughton Decl. ¶ 12.)  No deduction for such fees is allowed pursuant to the terms of the Note.

6.    $22,333.52 for "Insurance Expense"

- Defendants' counsel forwarded insurance premium financing invoices for HRW in the amount of $22,276.50.  (MacNaughton Decl. ¶¶ 7-8.)

- The remaining $57.02 is unsupported by documentation received to date.  No deduction for such fees is allowed pursuant to the terms of the Note.

7.    $14,467.84 for "Utilities"

- Defendants' counsel forwarded electricity bills for HRW in the amount of $10,225.41.  (MacNaughton Decl. ¶¶ 13-15.)

- The remaining $4,242.43 is unsupported by documentation received to date.  No deduction for such fees is allowed pursuant to the terms of the Note.

8.    $1,228.50 for "Computer and Internet Expenses"

- Defendants' counsel forwarded internet service bills for HRW in the amount of $808.90.  (MacNaughton Decl. ¶¶ 9-11.)

— 13 —

- The remaining $419.60 is unsupported by documentation received to date.  No deduction for such fees is allowed pursuant to the terms of the Note.

9.    $249.50 for "Bank Service Charges" (MacNaughton Decl. ¶ 5.)

- No deduction for such fees is allowed pursuant to the terms of the Note.

Ralls was not only unaware of, but never authorized any of the payments at the time they were made, nor did Ralls authorize these alleged "expenses."  As a result of these unauthorized and abusive payments, HRW has committed additional breaches of the Loan Agreement and the Note, and is also in default under the Note.  (Liu Decl. ¶ 22.)

As noted, HRW's sole purpose is to own the Wind Project.  The only individuals present at the Wind Project day-to-day are employed by Ralls pursuant to a Maintenance and Warranty Services Agreement between HRW and Ralls, and the only day-to-day operations at the Wind Project are performed by those Ralls employees.  (*See* MacNaughton Decl. ¶¶ 18, 22.)  As a result, HRW is unable even to determine the total electricity generated by the Wind Project without Ralls' assistance.  (*See* MacNaughton Decl. ¶ 18.)  Nonetheless, as shown by documents submitted in support of the "Profit & Loss" statement, Zhang has caused HRW to

enter into an executive employment agreement with his wife and an asset management agreement with his own wholly-owned entity, USIRE, which combined commit HRW to paying out $615,000 annually to Zhang and his wife for apparently spurious services, while at the same time rendering HRW essentially insolvent.  (*See* MacNaughton Decl. ¶¶ 2, 3, 4, 6.)

In connection with the Loan Agreement, HRW made express representations, including the following:

> (ii)    The Borrower has not incurred, nor does it intend to or believe that it will incur, debts (including contingent obligations) beyond its ability to pay such debts as such debts mature (taking into account the timing and amounts of cash to be received from any source, and of amounts to be payable on or in respects of debts); and the amount of cash available to the Borrower after taking into account all other anticipated uses of funds is anticipated to be sufficient to pay all such amounts on or in respect of debts, when such amounts are required to be paid; and

> (iii)    The Borrower will have sufficient capital with which to conduct its present business, and the property of the Borrower does not constitute unreasonably small capital with which to conduct its current business at present levels of operations.

(MacNaughton Decl. ¶ 19, § 4.1(m)(iii).)

Ralls expressly relied upon HRW's above representations regarding its intent not to enter into agreements impairing the ability of HRW to meet its

obligations as well as its representation regarding Borrower's own capital reserve sufficient to conduct its business.   However, Borrower (HRW) now apparently represents that due to the demonstrated negative cash flow, HRW cannot make any payment to Ralls.[3]

### C.      Zhang's Control Places Ralls' Collateral in Imminent Danger.

As the sole owner of USIRE, and Managing Member of both USIRE and HRW, Zhang exercises complete control over HRW.  (Liu Decl. ¶ 23.)  Zhang has made clear to Ralls that he and the entities he controls have no intention of honoring HRW's obligations under the Loan Agreement and the Note.  (Liu Decl. ¶ 24.)  Moreover, as confirmed by the Profit & Loss Statement and documentation purportedly supporting Defendants' calculations of Net Cash Flow, it is clear that Zhang is misappropriating Ralls' collateral (in the form of the SIEA Revenues that are required to be paid to Ralls to service the Loan) for his own enrichment, including improperly diverting the SIEA Revenues to pay his wife's salary, as well

---

[3]  Zhang, on behalf of HRW, represented in the Loan Agreement that HRW would "have sufficient capital with which to conduct its present business." (MacNaughton Decl. ¶ 19, § 4.1(m)(iii).)  But for HRW's payment of unauthorized payroll and professional fee payments alone, the income from SIEA would have produced a net income, by Defendants' calculation, of $129,346.40 and resulted in a payment to Ralls in the amount of $122,879.08 (*i.e.*, 95% of Net Cash Flow).

as his own company's (USIRE's) spurious "asset management fees." (Liu Decl. ¶ 25; MacNaughton Decl. ¶¶ 2, 3, 4, 6.)

As a result, Zhang's and HRW's blatant refusal to comply with the express terms of the Loan Agreement and the Note presents a manifest danger of loss, destruction or material injury to Ralls' collateral securing the Loan and the Note. (Liu Decl. ¶ 26.)   Accordingly, Ralls must necessarily petition this Court for appointment of a receiver in order to preserve the collateral, protect its secured interests and prevent Zhang from continuing to flagrantly misappropriate all revenues of HRW, which action not only clearly violates the express terms of the Loan Agreement and Note, but would render worthless any judgment Ralls might ultimately recover.[4]

## **ARGUMENT**

As a result of HRW's clear and egregious defaults under the Loan Agreement and the Note, and the imminent threat to Ralls' collateral presented by Zhang's total control over HRW and his unauthorized and wasteful spending of

---

[4] Not only do the recently produced documents regarding Defendants' misappropriations and misconduct conclusively establish HRW's liability for breaching its obligations to Ralls under the Loan Agreement and the Note, they also conclusively establish Ralls' claim against HRW for converting the SIEA Revenues in Count III of the Complaint and likewise establish Zhang's and USIRE's liability as alter egos of HRW as alleged in Count IV of the Complaint.

revenues that should be used to service the Loan, this Court should appoint a receiver[5] to receive all payments from utility companies to HRW and distribute those payments in accordance with the Loan Agreement and Note.

Federal law governs the appointment of a receiver in a case founded on diversity jurisdiction. *See Nat'l P'ship Inv. Corp. v. Nat'l Hous. Dev. Corp.*, 153 F.3d 1289, 1292 (11th Cir. 1998). Federal courts have inherent equitable power to appoint a receiver to manage a defendant's assets during the pendency of litigation. *See In re McGaughey*, 24 F.3d 904, 907 (7th Cir. 1994). Once appointed, the receiver is vested with complete jurisdiction and control of the property in any district. *See* 28 U.S.C. § 754 ("A receiver appointed in any civil action or proceeding involving property, real, personal or mixed, situated in different districts shall, upon giving bond as required by the court, be vested with complete jurisdiction and control of all such property with the right to take possession thereof.").

Equitable principles weigh in favor of appointing a receiver in this case. The factors that federal courts consider in deciding whether to appoint a receiver include: "[1] a valid claim by the party seeking the appointment; [2] the

---

[5] Ralls proposes GlassRatner Advisory & Capital Group, LLC ("GlassRatner") as receiver. The Declaration of Michael A. Shenk, filed contemporaneously herewith, demonstrates that GlassRatner is competent to serve as receiver in this case.

probability that fraudulent conduct has occurred or will occur to frustrate that claim; [3] imminent danger that property will be concealed, lost or diminished in value; [4] inadequacy of legal remedies; [5] lack of a less drastic equitable remedy; and [6] likelihood that appointing the receiver will do more good than harm." *Otero v. Vito*, No. 5:07-cv-405, 2008 WL 4004979, at *3 (M.D. Ga. Aug. 25, 2008) (citing *Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc.*, 999 F.2d 314, 316 (8th Cir. 1993)); *see also Bookout v. Atlas Fin. Corp.*, 395 F. Supp. 1338, 1341 (N.D. Ga. 1974) (same).

The facts of this case, as recounted in the accompanying Declaration of David Liu, the exhibit attached thereto, and the exhibits attached to the Declaration of John P. MacNaughton, clearly satisfy the factors relevant to the appointment of a receiver.  First, Ralls has valid claims against Defendants, as they have defaulted in multiple respects under the Loan Agreement and the Note,[6] and Ralls has a security interest in the collateral.  *See Bookout*, 395 F. Supp. at 1341 (finding factor satisfied where evidence showed the execution of the security agreements, the nature of the collateral and the repeated transfers and assignments of the collateral).  Second, Zhang's conduct to date has frustrated Ralls' claim under the

---

[6] *See also supra* note 4.

Loan Agreement and the Note, as he has not only repeatedly refused to honor HRW's obligations to Ralls, but his behavior makes clear that he will not make the required payments to Ralls in the future. *See Otero*, 2008 WL 4004979, at *3 (finding factor satisfied where defendant formed various sham business entities designed to act as his *alter ego* and conceal his assets and financial transactions). Third, Ralls' interest in the collateral is in imminent danger because, based on the Profit & Loss Statement and supporting documentation, among other things, it is clear that Zhang is misusing Ralls' collateral (in the form of the SIEA Revenues that are due and payable to Ralls to service the Loan) for his own enrichment, including improperly diverting the SIEA Revenues to pay his wife's salary and specious "asset management fees," and apparently funding the defense of this action, rather than to service HRW's debts to Ralls, all leading to the apparent insolvency of HRW. *See Bookout*, 395 F. Supp. at 1341 (finding factor satisfied where there was danger that the collateral would be dissipated or squandered).

Available legal remedies and less drastic equitable remedies will not protect Ralls' interests. Ralls' interest in the collateral cannot be fully protected unless this Court appoints an independent fiduciary for the narrow purpose of receiving the payments from SIEA and disbursing them pursuant to the Loan Agreement and Note. Ralls has attempted to work with Zhang to resolve this dispute, but Zhang

has caused HRW to fail to perform its responsibilities under the Loan Agreement and the Note, including refusing to open and administer an account mutually designated by Ralls and HRW, and to calculate Net Cash Flow properly, as required by the Loan Agreement. *See Otero*, 2008 WL 4004979, at *3 (finding legal remedies were insufficient because of defendant's refusal to cooperate and less drastic equitable remedies could not resolve "the complicated web of entities and transactions woven by Defendants").

Lastly, the appointment of a receiver will do more good than harm. *See Bookout*, 395 F. Supp. at 1341 (finding the probability that any hardship to defendants would be outweighed by the potential hardship to plaintiff if appointment were denied). HRW will continue in operation and the collateral will be maintained under the receiver's supervision. The receiver will manage the receipt and distribution of SIEA revenues pursuant to the terms of the Loan Agreement and Note, or at a minimum maintain said revenues free from further misuse pending further order of this Court. Otherwise, Zhang will continue to misappropriate and dissipate HRW's assets and revenues for his own benefit.

## CONCLUSION

For the foregoing reasons, Ralls respectfully requests this Court enter an order appointing a competent receiver to manage and operate HRW.

Respectfully submitted, this 6th day of February, 2014.

**MORRIS, MANNING & MARTIN, LLP**

By: /s/  John P. MacNaughton
    John P. MacNaughton
    Georgia Bar No. 464550
    Ross A. Albert
    Georgia Bar No. 007749
    Brian J. Levy
    Georgia Bar No. 302518

*Attorneys for Plaintiff Ralls Corporation*

1600 Atlanta Financial Center
3343 Peachtree Road, NE
Atlanta, Georgia 30326
Telephone: (404) 233-7000
Facsimile:  (404-365-9532

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7.1D, the undersigned counsel certifies that the foregoing pleading has been prepared in Times New Roman 14 point, one of the four fonts and points approved by the Court in Local Rule 5.1C.

/s/  John P. MacNaughton
John P. MacNaughton
Ga. Bar No. 464550
MORRIS, MANNING, AND MARTIN, LLP
1600 Atlanta Financial Center
3343 Peachtree Road, NE
Atlanta, GA 30326
O: 404-233-7000
F: 404-365-9532
jpm@mmmlaw.com

*Attorneys for Plaintiff Ralls Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing

MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR APPOINTMENT

OF RECEIVER was filed electronically via CM/ECF in the United States District

Court for the Northern District of Georgia on February 6, 2014, with notice of

same being electronically served by the Court to all attorneys of record.

/s/  John P. MacNaughton
John P. MacNaughton
Ga. Bar No. 464550
MORRIS, MANNING, AND MARTIN, LLP
1600 Atlanta Financial Center
3343 Peachtree Road, NE
Atlanta, GA 30326
O: 404-233-7000
F: 404-365-9532
jpm@mmmlaw.com

*Attorneys for Plaintiff Ralls Corporation*